In Error. — The facts appearing in the bill of exceptions are as stated in the opinion of Roane, J.
The same question is raised in this case as was in that of Catron's Lessee v. Charles Lowry and Alexander Lowry, which has been twice argued at Carthage, and is yet depending on an advisari. My opinion is formed in that case, and is the same that I think ought to be delivered upon the same question in this. I will therefore, for the purpose of being the more clearly understood, state the facts of that case and my opinion upon them for the governance of both so far as my opinion goes. In Catron's Lessee v. Lowry, the facts were argued and are as follows: —
The parties agree that the following are the facts in this cause. The plaintiff's title is by virtue of a grant issued by the State of Tennessee to the lessor of the plaintiff, upon an entry made in the third surveyor's district; which grant is dated on the _______ day of ______, 1815, and prior to the session of the General Assembly in said year, upon an entry dated the ________ day of ______, 1814; said grant covers the land in controversy, of which defendant was in possession at the date of said entry and grant, and of issuing the writ in this cause. The defendant derives his title by virtue of a grant issued by the State of North Carolina on the 7th day of March, 17%, upon a military warrant issued by said State; the title under said grant was regularly conveyed from the grantee to the defendant before the date of the entry and grant under which plaintiff claims title, and at and before those several periods the defendant was in possession of said land under said grant and the title conveyed to him. Said *Page 166 
grant covers the land in controversy of which defendant was in possession as aforesaid. The said land now in controversy is situated about two and a half miles east of a line running south from where the Kentucky line crosses Cumberland River, as said line was run by William Christmas, the late principal surveyor of the first district in this State, in the year 1807; the eastern boundary of the reservation of lands for the officers and soldiers of the continental line of North Carolina was never run and marked by the State of North Carolina, and out of the military reservation as prescribed by the act of North Carolina, nor was the same ever marked until the same as aforesaid by the State of Tennessee, and recognized as the eastern boundary of the first district. Said land is situated about forty miles south of the Kentucky line, where the same crosses Cumberland River.
It is agreed by the parties that, on the within statement of facts, the Court may pronounce judgment as upon the finding of the same by a jury; and if it should be the opinion of the Court that, from the law arising thereon, the plaintiff ought to recover, that judgment be entered for the plaintiff for his costs and term and damages; and if, upon said facts, the law be for the defendant, that a judgment be entered for the defendant, and that he recover his costs. It is mutually agreed by said plaintiff and defendant, by their counsel, that the cause. John Catron's Lessee v. Charles and Alexander Lowry, he transferred to the Supreme Court of Errors and Appeals for said circuit, to be there finally decided upon the facts agreed by said parties, and entered upon record.
As has been stated from the bar, the question made by this case agreed has come often before the courts of this State, and has received different determinations. In this contrariety of decision, and without reference to the opinions on either side, which are entitled to the greatest respect, I shall consider the *Page 167 
case being unsettled as res integra, and take it up as it was argued at the bar.
Two general positions have been taken: 1st. That the defendant's grant is void; and 2d. That, being void, this can be shown on a trial in ejectment.
To establish the first position, three grounds have been assumed on argument: 1st. That the State's officers had no authority to issue a grant for land upon a military claim by the Act of 1783, c. 3, section 7, lying out of or beyond the bounds prescribed by the said seventh section of the said act. 2. That the Act of 1783, c. 3, section 7, not having given such authority, it can not be considered as embraced by the Act of April, 1784, c. 14, section 7; and 3d. As certainly not authorized by Act of October, 1784, c. 19, section 7. It seemed to be admitted that, if authority is not conferred by one or other of these acts, the grant is void, a nullity itself, and pursuant to the opinion of the Supreme Court of the United States, in the case of Polk's Lessee v. Wendal and others, in 9 Cranch, 99. OH the other hand if either of these grounds failed, the deduction therefrom, to wit, that the grant is void, failed therewith.
It is first to be observed what was the object of North Carolina in these Acts of 1783 and 1784. The State of North Carolina in the war of the Revolution, in conjunction with her sister States of the Union, constituted an efficient party in carrying, on that war, and in maintaining the independence which had been declared. In doing this she had men to raise in making up her quota in the general cause; and also to supply, from time to time, the deficiencies which the casualties of war produced. These troops were to pay, and money besides was wanted for many other purposes, as is usual in such cases, much beyond her supplies; at the close of the struggle, therefore, she found herself a debtor State. To discharge this debt was the object of these laws and others not yet *Page 168 
mentioned. Her engagements were of two kinds, for land and for moneys. She contracted with her troops for the first, but not exclusively, and with her general creditor for the second. For the purpose of satisfying these different engagements, these acts were passed; or, as she has expressed it, for the redemption of specie, and other certificates, which were documents of her public debt in the hands of her general creditor, and for discharging the arrears due to the army she passed the Act of 1783, c. 2; and, to render an effectual and permanent reward to her continental officers and soldiers in her service for their signal bravery and persevering zeal, she passed the Acts of May, 1780, of 1782, c. 3, and of 1783, c. 3; and, to further the objects in view by these acts or some of them, she afterwards passed the Acts of 1784, c. 14, section 7, April session; and 1784, c. 19, section 7, October session. These acts either appropriate or authorize the appropriation of the greater part of her western lands, by her military claimants and by others who might become claimants, by complying with the terms in them prescribed. It would be unnecessary here to quote the passages, — they are known to all, — they have been the subjects of consideration for years past; and references by year, chapter, and sections will be sufficient in order to be understood. In the year 1780, North Carolina ceded the tract of country in which the land in controversy lies, together with all that which now composes the State of Tennessee, to the United States; expressly upon condition that all lands laid off, or directed to be laid off, by any act or acts of her General Assembly, for her officers and soldiers shall be insured to their use and benefit, and that of their assigns respectively, and where titles under these acts have not been perfected, the governor shall from time to time perfect them in the same manner as if this act had never been made. And all rights reserved by any act or acts, c., c., *Page 169 
shall continue to be in full force in the same manner as if this cession had never been made. 1789, c. 3, sections 1, 2. The defendant in the cause is the assignee of a soldier under these acts, whose grant issued to him in the year 1792, from the State of North Carolina, by virtue of the provisions contained in the Cession Act. The plaintiff is a claimant under the State of Tennessee by grant issued to him long after the issuing of that to the defendant. Both grants cover the same land, and, before any title set up under the younger grant can be acknowledged, the elder grant must be impeached and disposed of; the question therefore necessarily turns upon the validity of the elder grant.
It is argued for the plaintiff that it must have been the understanding of the legislature of North Carolina in 1783, and her intention, that the satisfaction of her soldiers' land claims should be made within the bounds prescribed by the seventh section, and third chapter of the act of that year and not otherwise; and, in support of this, it is said, first, that the intention of the legislature is to be collected from the legislative act itself, according to certain rules of construction which the common law has adopted and laid down for the interpretation of statutes; that one of these rules is, that if an affirmative statute which is introductive of a new law direct a thing to be done in a certain manner, that thing shall not, even although there are no negative words, be done in any other manner. 6 Ba. Abr. 377. That therefore the Act of 1783, c. 3, section 7, assigning the bounds for the satisfaction of the military land claims of the North Carolina line, can not be satisfied elsewhere, and the defendant's grant in the present case, being one of these, claims, and lying out of, or comprising lands not within these bounds, is void.
It is true that in all cases the substantial parts of a statute must be complied with and pursued; for this is to further the intention of the legislature, and is *Page 170 
the particular thing to be regarded. It points out the object to be accomplished by the legislative act. In attaining this Object, the words are oftentimes disregarded, and even particular provisions are disregarded, as in the instance put in Bacon's Abridgment, subjoining the rule quoted upon the Statute 43 Eliz. c. 2, which requires overseers of the poor to be nominated yearly in Easter week, or within one month after Easter, under the land and seal of any two or more justices of the peace, in the same county (whereof one to be of the quorum), dwelling in or near the same parish or division where the parish does lie. Notwithstanding the affirmative and imperative words and provision of the act; which, together with the 39th of Eliz., is introductive of a new law; and forms, in English expression, the Magna Charta of the poor, the Court ordered a mandamus to issue, to supply what? not some formality in the appointment; not some defalcation extending to a part only of the provision; but to supply the whole provision of the first section of the statute. Upon what grounds? To carry the intent of the legislature into effect, that the object of the statute might be accomplished, not defeated, which was the maintenance of the poor. Although therefore the justices who by the act were authorized and required to do this, had failed to appoint overseers altogether; yet the Court, after the lapse of time within which the statute gave the authority for its being done, ordered by mandamus the thing to be done, notwithstanding the objection of a new law and that affirmative; for, say they, against the justice and meaning of it, no negative shall be implied, and it must be liberally construed. See 2 Str. 1124. As opposed to this, the case in 1 Bur. 445 was cited; the question there was, whether the appointment of five overseers was good when the statute says four, three, or two. It was decided the appointment was not good. This does not impugn the case *Page 171 
in Strange, as I understand it, but supports its principle; to wit, that the power given by the statute of Elizabeth, being for the maintenance of the poor, shall be executed for them in a beneficial manner, and to their advantage. Now the case in Burrow does not contradict this. The appointment of five overseers was not good; why? It was not beneficial to the poor, but the contrary, and therefore did not further the views of the legislature. And the reasoning of the judges shows this; for in rendering their opinions they say, a great number may not do business better than a smaller, and it is attended with a greater expense, and that when business is assigned to a number to be done it produces the delegation of the actual transactions of it to a few. See 1 Bur. 448, 450. These oases sufficiently prove that the rule relied upon from Bacon's Abridgment, 377, is not of that absolute, fixed, and uncontrollable kind that can not yield and which can not be transgressed; but that it is of that arbitrary, technical, and artificial kind which may be exceeded or departed from for good reason. That it is resorted to as a substitute for expressing the will of the legislature when that will is equivocal and not apparent; but when the will of the legislature is apparent, or may be reasonably collected and inferred, it gives way to the presence of that, for which it is a substitute, and is controlled by it, as in the above case. Considering this rule, therefore, as only indicative of the intention of the legislature, and resorted to for this purpose, and that the intention of these acts is apparent from the acts themselves and may be well collected from them, it can not govern the present case. I shall state what I conceive to be the intention of North Carolina in these acts, as far as it bears upon the question, after I have noticed another case or two presented upon this point.
Wilson and Mason, 1 Cranch, 68-102 was cited and much relied upon for its general reasoning as *Page 172 
applicable to the present, and also to show that particular or limited powers must be strictly pursued, or the consequent acts are void. It is to be observed the cases are not parallel. Wilson and Mason was a controversy between two purchasers of the same kind (money purchasers, I presume), and under the same act, that of Virginia, 1779. The present is between a like purchaser, and a military right or claimant under different acts. That a contrast between an entry and a survey upon acaveat, this between two grants in ejectment. It can not be seriously contended that all the principals which would govern the question between two individuals on a caveat would, or ought to have, the like efficacy upon a grant that the subordinate matters anterior to the emanation, of a grant should control its operation, and decide its validity after issuance under all the solemnities of law. No point seems to be better settled than this, that many objections which upon a caveat might be urged with success against the issuing of a grant to a party upon a particular claim, cease to affect that claim after the emanation of the grant. As in cases of occupancy who has the occupant right; 2 Tenn. 197, 198. On the locality of a conditional line between two contiguous occupants, or other agreement of the contending parties; October, 1779, c. 4, section 5, so between two entries when the bounds intersect; April, 1779, c. 6, section 6; also a peaceable possession with an inprovement for seven years with in the bounds of a former entry, without interruption or declaration of right from or by the person claiming under such former entry, preference shall be given to the settler in peaceable possession. Ib, section 2. By Act of 1778, c. 3, section 7, surveyor shall run dividing lines between party and party, according to directions received from them or agreeable to directions' from a jury, without regarding the cardinal points. Also by Act of 1777, c. 1, section 6, disputes respecting bounds and priority of occupancy *Page 173 
shall be passed upon by a jury, who shall go on the premise and hearing the allegations of the parties, and the testimony of witnesses, are to render a verdict to the Court, which, being entered with the entry taker, the party shall have an order of survey, c.
But in all these cases of the patent issuing to the person not entitled, that is, to him who by the result of a caveat would be adjudged not to be entitled, provided the case had been examined, and the parties' rights controverted, pursuant to the provisions of these different statutes or acts of assembly, — which may happen, either when there has been no caveat, the filing of it having been prevented by fraud; or, where there has been one, and the determination upon it anticipated by the fraud of the party surreptitiously obtaining the first grant, or where the determination on the caveat has been influenced by the corrupt practice of the party, can it be said that after the grant has issued the case is open for these objections, and for examination on ejectment; and that the grant may be declared void, and deemed a nullity if it ought not to have issued in the manner it did, it being to the prejudice of the other party who had the better right? It can not; an undeniable train of supporting decisions in this State, and in North Carolina and elsewhere, say the reverse.
The remaining authority on this ground is the case of Polk's Lessee v. Wendal and others, in the Supreme Court of the United States, which lays down this doctrine; to wit, "there are cases in which a grant is absolutely void; as where the State has no title to the thing granted, or the officer no authority to issue the grant." 9 Cranch, 99. This authority states two cases where the grant is absolutely void. The first does not apply, for it is admitted on either side that the State had a title to the thing granted. It is presented on account of the second case, and it is said that the defendant's claim being a military one was *Page 174 
by the Act of 1783, c. 3, section 7, directed to be located within the bounds prescribed by the said seventh section, which not being done, but located elsewhere, the officer had no authority to issue the grant. I subscribe to the doctrine contained in the above two cases as I understand them. They are corroborated by the decisions of some of the States which I have seen, and they may be by all for what I know; I have not seen all. Indeed they seem to be the essence of these decisions extracted, and concisely expressed. The State may be said to have no title to the thing granted, in the case of land where it lies out of the limits of the State, for there the right of another sovereignty takes place; as a grant for land purporting to lie in some county adjoining the Virginia, Kentucky, or other neighboring State line, and its actual location is beyond that line, and covering land in such neighboring State, there the grant is absolutely void; so where the State has given away a portion of her territory for a particular time or use, as the reservation of the lands comprised within the limits prescribed in the fifth section of the second chapter of the Act of 1783, making and stating the said bounds to be a reservation to the Cherokee Indians and their nation forever; there she has divested herself of the title until acquired by some future act, so also the common case when the State has granted land to an individual. In all these cases, the grant may be said to be absolutely void for want of title to the thing granted. In the first case, the State never had any title, and in the others she had previously parted with her title, and nothing was left for the grant to operate upon. Under the second case; to wit, where the officer had no authority to issue the grant, — may be properly comprised those cases where the State still holds the right or title to the land, but has said that she will not part from it, and consequently has forbidden her officers who are the instruments for passing her title or interest in her lands, authorized *Page 175 
and instructed for the purpose, to make a disposition of them. Such are the instances in the Act of June, 1781, c. 7, section 7; the words are: "it shall not be lawful to enter any lands with any entry taker in this State, and in case any shall be entered after the passing, the same are declared null and void. And every entry taker is strictly required to forbear making any further entries on any pretence whatever." By this law the whole of the functions of the State officers for the passing of her title to lands is suspended, and their authority withdrawn. This act was repealed by 1783, c. 2, section 2. Suppose, after the passage of this, and before its repeal, an entry had been made, and the land so entered had passed into a grant by the State's officer, it would have been an instance of a want of authority in the officer of the State to issue, and an example of the second. So in the Act of 1783, c. 2, section 6, is another instance where the officer has no authority to issue without taking into view the fifth section of the same act. So in like manner is another instance in the twelfth section of the Act of 1783, c. 2, which forbids the entry of the great island in Holston River, and declaring that if any such should be made, it is void; without taking into view the treaty referred to in said section. Another instance is furnished by the Act of November, 1777, c. 1, section 3. Between all these and the case before the Court, it is conceived a great difference exists; and that they are also very different from cases of irregularities, or imperfect execution of authority in not strictly pursuing it, or omissions, or mere frauds in the officers issuing the grant. In the instances put, the authority of the State's officers appointed for the purpose, and intrusted with the execution of all the formulae prescribed for commencing, prosecuting, and perfecting the title in the grantee to lands, and of passing from the State her title to the same, ceases to exist in some form or other, whether by suspension as in some, or by abrogation as in others. The *Page 176 
authority to act in any manner is done away. The State has declared her will that her interest is not to be transferred, and that, if attempted, the acts of her officers therein are void, a mere nullity, having no effect whatever.
I shall now make an application of the doctrine in Polk and Wendal, as I understand it, to the case under consideration, and in doing this I will admit in effect as the plaintiff's counsel contend, that the State's officer had no right in one sense to issue the grant in question to the defendant; that is, that he had no directions to issue a grant on the defendant's claim, being a military claim, for land in John Armstrong's bounds. The statement, then is this; North Carolina authorized her officer to issue grants upon military claims, for the land comprised within the military bounds designated in the seventh section of the third chapter of 1783, and she authorized her officer to issue grants upon John Armstrong's claims for lands within John Armstrong's bounds. The officer, however, instead of pursuing his authority strictly, issued the defendant's grant, being a military claim, for land comprised within John, Armstrong's bounds. Now, this was an irregularity in the execution of his authority, or a non-pursuance of its directions, but the land's within both bounds, the military and John Armstrong's, were grantable by order of the State. The officer had a right to issue a grant passing the State's title to both; the one to one claimant, the other to the other. But the officer has granted a part of John Armstrong's bounds to a different claimant than the law comtemplated; the question is. Does this make the grant absolutely void? My opinion is that it does not. Were the defendant's claim to be considered as that of a purchaser simply, and as similar to a claimant in John Armstrong's office, and without taking into view any other acts than those of 1783, I would have no hesitation in saying that it was voidable by suit for *Page 177 
this irregularity, upon process and proceedings suitable and authorized for this purpose. But as this claim is, I have my doubts whether it is even voidable, as I shall state presently. I think I am well supported by authority in my opinion that this grant is not absolutely void. The case of Sears v. Parker, in 1 Haywood, 126, 135, is parallel to the present. The defendant Parker was a claimant of confiscated property under the laws of North Carolina, to-wit, land which had belonged to M'Culloch; but the grant contained other land besides M'Culloch's; to-wit, vacant land. This vacant land contained in Parker's grant, Sears afterward obtained a grant for, and brought his ejectment, and it was decided he could not recover, for by the Court, Ashe and Williams. JJ., we have often decided, and are now of opinion, that the State having granted vacant lands, the first patentee will be entitled to hold them, notwithstanding any attendant circumstance that wilt render the grant voidable until it be actually avoided. In this case the defendant, Parker, is a claimant of confiscated lands by purchase of a certain quantify specified, and the State's officer is directed to issue a grant in satisfaction of the purchase-money.
So in the principal case the defendant. Lowry, is a claimant of military lands for services as a soldier, of a certain quantity specified, and the State's officer is directed to issue a grant in satisfaction of these services.
In that case the land is particularized that is to be passed by the grant to the claimant; to-wit, confiscated land, and it is to be within certain bounds designated by the grant to M'Culloch.
So in This case the land is particularized that is to be passed by the grant to the claimant; to-wit, military land, and to be within certain bounds designated in 1783, c. 3, sec. 7.
Parker's grant, however, contained other land than *Page 178 
that directed to be granted to him; to-wit, vacant land; but it was grantable also upon a proper claim by the State's officer.
So likewise Lowry's grant contained other land than that directed to he granted to him; to-wit, vacant land also, likewise grantable on a proper claim by the State's officer.
As Lord Ellenborough expresses it, these two causes run or all fours with each other. The principle in both is precisely the same. The State's officer did not pursue his authority; he granted the lands to a wrong claimant; he had a right to act, but he acted improperly. Having, however, the authority to act, his act is not void, — so says the book, — though it may be avoided.
The same is held to be the law in a similar case in the State of New York, from what fell from the Chief-Justice Thompson, in the case of Jackson v. Goes, 13 Johnson, 524. He says. If the commissioners of the land office had mistaken their powers, and made a grant to a person not coming within the description in the act, and the patent was sought to be vacated on that ground, there can be no doubt but it must be done by some direct judicial proceeding. Now this is precisely the case in Haywood's Reports and the present case. In the present case, the commissioners of the land office — that is the governor and secretary — issued the grant to the person, says the argument, not coming within the description of the act. The person coming within the description in the act, they say, would be a John Armstrong claimant; but the grant is not made to such a claimant, but to a military claimant that does not meet the description. What is the consequence? Says the book, if the grant is sought to be vacated on this ground, it must be by some direct judicial proceeding. From this, three things are plainly inferrible: 1st. That in the State of New York Lowry's grant would not be considered void; 2d. *Page 179 
At most it would be only voidable; 3d. That the matter in avoidance could not be shown on a collateral issue, as not guilty in ejectment.
With these cases of Sears and Parker, Jackson and Goes, exhibiting what is an improper execution of, or non-pursuance of authority by the State's officer, in issuing a grant, and the effect thereof, may be noticed and contrasted the cases of the University of North Carolina v. Johnson. 1 Haywood, 373, 375, and, and the same v. Sawyer, Taylor, 114, us furnishing instances where the officer of the State had no authority to issue the grant, with the effect thereof in illustration of the present point. In the case of the University v. Johnson, the lands had been granted by Lord Granville, in 1763, to Muckleheny, who left the State in a year or two afterwards, and was never more heard of; for want of heirs of Muckleheny, these lands escheated to the State, and by the Act of 1789, c. 21, sec. 2, were given to the University. The defendant, Johnson, in the year 1780, got a grant for them as vacant land. By the Court, Haywood, J., Williams, J., absent; I am of opinion for the University; the grant is absolutely void abinitio; and its invalidity may be shown on a trial in ejectment. It was issued by the officers of the State without any authority for so doing, and is no more binding than if issued by other persons not called governor or secretary. It is to be observed here that the defendant's grant issued in the year 1780, and the authority which the officer of the State had to issue grants, at that time, rested upon the Act of November, 1777, c. 1, sec. 3. That act authorizes the issuing grants for any lands which have not been granted by the crown of Great Britain, or the lords proprietors of North Carolina, in fee, before the 4th of July, 1770, or which have accrued or shall accrue to the State by treaty or conquest. Johnson's claim was not within the act, his lands had been granted by the lord proprietor before *Page 180 
the 4th of July, 1776, and though they had accrued afterwards to the State, it was not by either of the ways mentioned in the act, to-wit, by treaty or conquest, but by another way, to-wit, by escheat; they were therefore not grantable, and the officer had no authority to issue a grant in the case. The cases in Taylor's Reports is to the same effect. These authorities appear to me sufficiently to establish that Lowry's grant is not void, taking it upon the ground of authority and decision only, in cases similarly circumstanced, and this without the consideration as an additional circumstance, or an existing difference of intention in the Legislature between her military and other claimants, as respects the satisfying and perfecting their claims, and of this difference operating in favor of her military claimants. I shall now proceed to examine this intention, and whether this difference exists or not, must appear upon the face of the acts themselves, or be collected from them, taken in conjunction with the subject matter of them. By the Act of 1782, c. 3, sec. 6. North Carolina states the particular quantity of land each of her military claimants are entitled to have from her; she makes a recognition of a debt or duty in land which she owes them, and that for its satisfaction a tract of country had been reserved by act of assembly so long ago as May, 1780, to be appropriated for this purpose. She then goes on in the same Act of 1782, and directs steps to be taken for laying off the said land allotted to the officers and soldiers, in one or more tracts,c., and makes other regulations, progressively tending towards the discharge of this duty. She then afterwards, by the Act of 1783, c. 3 sec. 7, says, "that the officers and soldiers shall enter and survey the lands within the following lines," c., and specifies them. In the next section (8) is a prohibitory clause as to all others from entering the lands within the said bounds for three years after passing the act, with an *Page 181 
exception in favor of settlers on the Cumberland. River, and of the commissioner, surveyor, guards, and others who laid off the land, their respective quotas are permitted to be satisfied within the same bounds. These are the acts of North Carolina on which the military claim is founded, as far as regards the first ground of argument; and it is material for the expression of them to be noticed, for it differs widely from the expression of those acts oh which the other claims are founded, or the acts containing the general land law as it is called, laying open to the citizens of the State generally the vacant and disposable public lands thereof for sale. By the Act of 1777, c. 1, after declaring what lands are subject to entry, and the modes of perfecting titles to them, she; in sect. 9, prohibits any right or title to be acquired in any other manner, and if otherwise obtained shall be void. By the Act of 1783, c. 2, the entry offices which were shut by the Act of 1781, c. 7, are opened again, and the power and privilege of entering extended to all lands within the purview of the Act of 1777, c. 1, and in the same manner as by that act. By this Act of 1783, c. 2, also, the western boundary is extended to the Mississippi, and a portion of the lands contained within this extended boundary is directed to be Subject to the entry of ten-pound claims, but sub modo; it not alone simply says that claimant, of land, by the payment of ten pounds in specie or certificates for every hundred acres to be entered, shall enter to that amount, but virtually that they shall not enter elsewhere, by being expressly excluded from the balance by the words of the act; it prohibits such claimant from entering within the bounds set apart for the Cherokee Indians by sect. 6; it prohibits him from entering within the bounds reserved for the officers and soldiers of the continental line by sect. 12; and it prohibits him from entering the great island in Holston River by the same section. These are the *Page 182 
acts originating the opposing claim, and it is believed it would be going too far to say that the difference of the language used by the Legislature in these acts was accidental, and not intentional in them, and therefore not entitled to any specific consideration on account of the difference. A good reason for this difference is presumed to exist between the claimant under 1783, c. 2, and the claimant under 1783 c. 3. The claimant under the latter act is a military one, unlike the claimant under the former act; he is not a recent one; he is known to former acts; his claim is recognized as a preexisting one; himself a meritorious claimant, and the act a progressive step towards the completion on the part of the State of a previous contract entered into by her with him. As early as May, 1780, by her legislative act at Newbern, she reserved a tract of country to be appropriated in rewarding the signal bravery and persevering zeal of her officers and soldiers in her service. This act I have not been able to see, but from the mention made of it in the Act of 1782, c. 3, sec. 7, 1 take the purport of it to amount to an agreement to settle lands on the troops, and notwithstanding that therein no particular lands should be specified, supposing the case to be so, yet her lands must be considered as bound by this legislative act or stipulation, and, in point of dignity and solemnity, at least equal to the articles or covenant of an individual. If an individual covenant to settle lands, and no particular lands are mentioned in the articles, yet the covenant is a lien upon the lands of the covenantor that he then was seised of, 2 Vern. 483. The State was, therefore, under an obligation for the performance of her contract to her troops, in rendering them their respective quotas of land, and whether satisfaction could he made them within the limits assigned in c. 3, sec. 7, of 1783, or not, impaired not the obligation, the performance could not depend upon these particular limits, or be measured *Page 183 
by them; for the lien equitably extended to all her disposable western lands, as in the case of an individual, it would to all the lands he was seised of at the time of the contract for it might even afterwards acquire according to 2 Vern. 97. And we are not to presume that the State would be deficient in good faith, or would consider an obligation less binding on her than on a citizen, or that a different rule of equity should regulate her conduct; the operation of which would give a latitude in her favor forbidden to the other. These being her obligations, the expression of the seventh section of the third chapter of 1783 may be well accounted for, and considered as indicative of her intention in performing her contract pursuant to the principles of equity. Indeed this intention sufficiently and expressly appears in all her acts of assembly on this subject.
How stands the claimant under the Act of 1783 c. 2? he had no right or interest previous to that act, and his own proceedings subsequent thereto; he was not a party to a former contract; he is not considered in the light of a creditor to the State, coming forward to have his debt discharged by virtue of a former obligation. He is viewed by the act us a purchaser, and although the price given for the land may be the document of a; debt due to him by the State, and operate an extinguishment of that debt, yet it may not be such document; it is still received as a price excluding the idea of a debt, and he himself is considered as a purchaser, not as a creditor. This document may be so disposed of or not at the option of the holder. It may be otherwise satisfied by a money payment, the proper fund for its discharge, and made so by the terms of the contract. Act of January, 1781, c. 3, sec. 7. This mode of extinguishing her certificate debt by the State of North Carolina is collateral to the contract by Which it was created, is accidental as to it; and on her part a cumulative *Page 184 
mode of payment, adopted by her for her own convenience, and without either obligation or compulsion on the side of the creditor of being acceded to by him. Hence, although the State by this act, expected and fully calculated upon a partial extinguishment of her certificate debt, yet she intended it to be so indirectly, and not eo nomine,
and therefore that the claimant should be a purchaser under the Act of 1783, c. 2, and not as a creditor under the Act of 1781, c. 3, sec. 7.
North Carolina, therefore, by the Act of 1783, c. 2, is considered as bringing a part of her western lands into market for the purpose of sale. She had, of course, the terms in her power; she had a right to say what lands she would sell and what she would retain; what was her price, and what would be received in payment. It can not, therefore, be expected that her language and her intention to these two different claimants should be the same, but different according to their cases and the nature of them.
The State of North Carolina, then, in 1783, c. 3, sec. 7, when she says, "the officers and soldiers shall enter and survey the lands within the following lines," hath not said that they shall not enter and survey beyond these lines, nor hath she by restrictive terms confined them within the said limits, as she hath the other claimants within their limits. Mark the expression, the soldier shall enter the lands; what lands? the lands within the following limits, not their claims, or their lands which might be considered as synonymous with claims; but the lands, thereby limiting and confining the land in these lines to the claim, not limiting and confining the claim to the lands. And for this reason, that otherwise her military claimant might have sustained an injury in derogation of her own contract, inasmuch as this claim ought to be satisfied at all events, whether the particular fund assigned was competent or not to the purpose. Not so *Page 185 
with the other claimant; he came forward at his own seeking, not clothed with a previous duty, to receive satisfaction which might or might not be then made, according to the capacity of the fund; but as a purchaser with his eyes open, of the identical thing, exhibited plainly before him anterior to the first step of appropriation taken by him, and repulsive of the possibility of mistake.
From this view of the Acts of 1780, 1782, and 1783, on this ground of argument, as no negative is expressed, none can be implied against the intention of the Legislature, apparent on the face of the acts taken in conjunction with the subject-matter. From this view, likewise, the grant to Lowry is not even voidable on the ground taken, if a proper proceeding should be commenced for this purpose.
2dly. It is next in the order of the argument at the bar to be considered, whether, if by the Act of 1783, c. 2, sec. 7, the defendant's grant was not authorized to issue for the land covered by it. It was embraced by the Act of 1784, c. 14, sec. 7, and so authorized. This is taking in the case of removal, and the first question is, Had the State's officer a power or authority in any military case whatever to remove? A secondary question would be, upon a proper occasion, whether the power ought to have been exercised in this particular instance. And here, first, it is to be considered whether this authority is given by the seventh section of the Act of April, 1794, c. 14. The words of the law are general; the operation of them seems intended to be general, and to extend to all manner of claims; there is no restriction confining the remedy given to one class of claimants in preference to another; and no reason can be perceived why the military claimant alone, as contended by the plaintiff's counsel, should be excluded from the benefit of an act introduced to give redress for a specified evil to which he is as incident, and as much exposed as any other claimant. *Page 186 
What is the evil specified? The previous legal appropriation of land to the prejudice of any enterer, his entry being thereby rendered ineffectual. Now does not this evil bear as hard on one sort of enterer as another, ceteris paribus, — upon the military enterer as the enterer in John Armstrong's office, or any other enterer; no difference can be perceived in their situation, and no difference ought to be in the redress of their, cases, and none under this law can be observed. The argument of the plaintiff turned on the word "entry" in the section under consideration. It was said "entry" was a term used in reference to Armstrong's claims, "locations" in reference to military claims. The terms, therefore, by the words did not include military claims. It may be here observed that this criticism is not strictly correct; for the very law which specifies the military bounds says the officers and soldiers shall enter and survey the lands within, c. If the criticism were correct, it would not govern the case; for the statute, being remedial, would be extended by equity to the military claimant, being within the same mischief. 5 Com. Dig. 257. So again, says Baron Comyns, in all cases within the same mischief, the case shall be construed within the intent, though it be not within the words of the statute. Ibid. 258. And this intention of the Legislature is to be gathered from reason. Plowd. 205. As before observed, no reason appears why the military claimant should be made an exception of. In previous acts of the Legislature, to say the least of him, he is considered and treated as meritorious a claimant as any. But it is not perceived that the act affords any room for the objection; the words "an entry" comprehend every case, and it is a well-known rule in the construction of statutes that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void or significant. 6 Ba. Abr. 380. *Page 187 
Believing the military claimant's case within the mischief of this act, what is the remedy given by it? "That on the words of the acts the surveyor shall and he is hereby authorized to survey the quantity on any vacant land in this State." This in express terms confers an authority for removal and survey elsewhere, on any vacant lands in the State.
Whether the officer has pursued his authority in this or any other case, in the steps antecedent to removal, and hath done his duty by the act of removal, is, what ought not, and can not, be made a question of, to affect the validity of a grant from the State on a collateral issue like the present. To constitute a legal discharge of duty in the officer, in this case, there must have been a legal entry by Lowry, or the person under whom he claims. This entry must have been for lands which had been previously granted, or entered and located. But if any or all of these particulars has not existed; for example, if there had been no entry of Lowry'.s claim, or, if an entry, an illegal one; or if the lands entered for Lowry had not been previously granted, or entered and located, but remained vacant and subject to appropriation, and, notwithstanding this, the officer had surveyed elsewhere, as he has done, in the officer it would be a breach of duty; it would be a malfeasance in his office; but should it or would it affect the grant? How could a purchaser under the grant guard against this? What are his means of information? Has he any adequate means? He certainly has not, for some of the particulars rest in the knowledge of the officer. Suppose he could inform himself of some of these particulars from the entry offices, yet how inconvenient would it prove in practice, so much so as to be a complete negative to information; other particulars of an officer's duty are not upon record, but are matters in pais, and rest in the breast of the officer himself. Is he to be resorted to for information, and if he is what prospects of *Page 188 
succeeding? If official duty and public trust are not sufficient, guards to correct conduct, can truth and candor from the violator be expected gratuitously to disclose it? (The conclusion is) vain would be the search, fruitless the attempt; and if the object was attained, the public would not find its account in the discovery. To make the highest public document of the landlord property of the country depend upon the execution of many particulars, antecedent to its issuing, for its validity would be unwise and impolitic, and, instead of aiding the rightful claimant, would endanger him by opening the door to excessive litigation. Instead of rendering more secure that property which in the eye of the law has ever been held entitled to the highest consideration, it would be shaking the greater part of the titles of the country by exposing them to the most worthless assailants through the avenues of perjury.
But it is also further said, on argument for the plaintiff, that, on this case agreed, no entry is stated, and we are not to presume one, when our decisions say a grant may be good without an entry. Besides, it is said you can not presume in favor of illegal acts, but you may do so in favor of legal ones. You must presume this case agreed contains the whole case, and there is no entry; therefore the doctrine of removals falls to the ground. This, in fewer words, is saying, there is no entry; therefore, the grant is illegal, and, as the grant is illegal, no entry can be presumed.
The strength of this objection consists in setting the statement of the case in opposition to the grant, and an inference deduced therefrom — to-wit, that there is no entry — against the presumption of law, raised by the evidence of the grant, that there is one. Let us examine this; what is the statement of the case? It is the allegations of the admissions of the parties placed upon this record, and submitted by act of assembly for the opinion of the Court. And what is a State grant? *Page 189 
It is a public record, 2 Bl. Co. 346; 3 Tucker's Blackstone 261, note 10; 10 Johns. 26, a record too evidenced in the most solemn manner by the great seal of the State, for it can not issue before it is recorded; this art of recording being one of the essentials constituting it a grant, and that before it issues. Act of 1797, c. 1, sec. 11; 1783, c. 2, sec. 15; 1783, c. 3, sec. 6, being a record, what does it import? It importeth in itself absolute verity; if pleaded, it shall not receive trial by witness, jury or otherwise, but only by itself. Co. Lit. 117 b. Records import in themselves such incontrollable credit and verity, as they admit no averment, plea or proof in the contrary, co. Lit. 260, and says Lord Coke, the reason hereof is apparent, for otherwise there never would be any end of controversies which should be inconvenient. And Mr. Justice Buller in his Nisi Prius, 221, says they are authentic beyond all manner of contradiction. A State grant or patent is a record of the highest validity and verity, and is conclusive evidence of its contents; to-wit, that the State has passed its title to the lands therein contained, it must at the same time be conclusive evidence that all the previous requisites existed that were necessary to authorize and render it a complete and lawful act, and which were material and traversable. Phillips, 218, 219; Co. Lit. 352, b, such for example as would have been examinable and controvertible upon a caveat, as the objection in the present case, the want of an entry, this being a material and traversable fact, would have been grounds upon an application to the governor for a suspension of the issuance of the grant till after investigation and determination, 1783, c. 2, sec. 21; as this objection might have been taken and redress thereupon had, if such defect existed, the grant having issued is conclusive evidence at law of the entry's existence, and also of its validity to authorize the subsequent measures pursuant to the course prescribed and leading to the consummation of *Page 190 
the title by the execution of the grant. There are many authorities in the books illustrative of this principle and in support of it. Such is the case in 1 East, 355; Phillips, 213. If a verdict finding several issues were to be produced in evidence, the opposite party would not be allowed to show that no evidence was offered on one of the issues, and that the finding of the jury was indorsed on the postea by mistake. See also 2 Dallas, 125. These authorities prove, first, that the grant is incontrovertible evidence of the entry, and, secondly, that the inference deduced is inadmissible. But if the statement had even in express terms negatived the actual existence of an entry, and the parties had put it down as a fact totidem verbis "that there was no entry," then I would say, that though the parties by their admissions may renounce the benefit of the law yet they can not thereby change it, and that the complexion of the case is not in the least varied, that the evidence of its non-existence being of an inferior nature to that evidenced by the grant could not prevail, and being incompatible with the rules of law the Court would be bound to disregard it.
It is remarked that our decisions have said a grant is good without an entry, perhaps it would be more correct to say, a grant is good without showing the copy of an entry, in the cases where the law requires one which in the general would be unnecessary, superfluous, and even improper. The existence of an entry by copy would be attested by the officer, he having the legal custody of it; a grant attests the same existence by evidence of a greater dignity, by the great seal of the State, and supersedes all inferior modes of showing the same thing it shows. A grant, being a public record, comprehends within itself every requisite for its existence, and emanating under the sanction of the great seal, possesses the highest evidence of them when it is itself used as evidence. But there are cases in which the copy of an entry is necessary to be *Page 191 
produced, not for the purpose of barely showing its existence, but to show the modifications under which it does exist, as where in the development of a title it is wished to give the grant an operation beyond the date of it; the copy of an entry is requisite for the exposure of particulars not appearing by the grant, not to show that the entry exists, for the grant does that; but to show how it does exist as to time or date, location c., c.
The third ground is, that the issuance of the defendant's grant is not authorized by the Act of 1784, October session, c. 19, sec. 7. The object of this act is a removal also, but provides for a different case to the act passed the former session of the same year. If its provisions had been the same, it would have been a work of supererogation merely. The purview of both is removal. This of October, 1784, is cumulative, and extends the benefit of removal to a case not before provided for in express terms; by the former act, removal is directed where the lands entered have been previously granted, located or surveyed, and under it an entry must have been made of the removed claim previous to the act of removal, in order to authorize the measure. This act embraces the case where no such entry had been made, and authorizes a removal, in the first instance, for the want of tillable land. So far, as well on one side as on the other, no difference of opinion exists on this act in the argument. But the question is, was the act intended to be operative, so as to authorize removals from the passing thereof, or from some future time, by the authority of some future act of the Legislature to be passed for this purpose on the same subject. The words of the act are, "that in case it shall happen that there is not a sufficient quantity of tillable land within the boundaries laid off for the officers and soldiers of the continental line of this State, the deficiency shall and is hereby directed to be made up on any unappropriated *Page 192 
lands within the limits of this State." These words do not seem to me to look to any further legislative act on the subject. What is the evil this statute intended to remedy? The want of a sufficiency of tillable land within the boundaries laid off. What is the remedy given? The making up the deficiency on any unappropriated land within this State. When is this remedy given? When the deficiency happens. How is it given? By this present act, the words are express, the deficiency "is hereby" directed to be made up, c., not by some future act. In discovering whether this was the intention of the Legislature on this point, it will assist our inquiries to take a view of the subject-matter of the act, that is the land and the claimants, and see how they stood at the time of the passing of this act. By the former act of removal, 1784, the Legislature contemplated one of two things, or perhaps both, either first, that the military claimant had by her acts on the subject originally a right to satisfaction on any of the vacant lands of the State, intended this 7th section of c. 14, only to be declaratory of that right, and to remove any doubt which might exist on the case raised by the assignment of bounds for their satisfaction by the Act of 1783; or, secondly, that early perceiving there was an inadequacy in the limits assigned to satisfy her military claim, they must ultimately at some time or other be satisfied beyond these bounds. She, by this act, at once said that where her military, claimant's first effort for satisfaction had been rendered ineffectual by the previous appropriation of another, he might go to whatever place satisfaction could he made him, without the circuitous route of another entry on that plaice, and there survey, c.
At this time also John Armstrong's office was shut, all entries were made therein that were intended by the State to be made, and a very considerable portion of the very best of the land subject to entry in that office was unappropriated. Again by the former act of *Page 193 
removal, April, 1784, entries that had been made in the office of John Armstrong upon lands previously appropriated in that office might be removed and satisfied on this residuum; and, by the same act, removed county warrants might be then satisfied also.
Such, then, was the state of things at the passing of this act of October, 1784; the fairest portion of the western lands of North Carolina had been entered in John Armstrong's office, and the office itself shut. Upon the remaining residuum had been turned loose the removed county warrants, removed John Armstrong's warrants, and removed military warrants in the specified oases, for satisfaction; and, all this six months before this time. Under this existing state of things, what room is left to induce a belief that the State of North Carolina did not intend the operation of this act to be immediate for satisfaction in case of want of tillable land? Why should the military claimant, if there was no tillable land, be driven to the circuitous route of entry in order to attach his claim upon this residuum? for by this process he could do it under the operation of the act of April, 1784; and such must have been the case, if the true construction of this act is that it was to operate by force of a future act thereafter to be passed, as contended upon argument, and upon future proof of the want of sufficiency of tillable land made to the Legislature; for he might well conclude that before these events might take place this residuum would be exhausted, and the redress held out by this act turn out to be only a bubble. Again, to say its operation should not be immediate but consequential upon the events stated, would form an anomaly in these laws, taking them and their purviews together. Upon the very face of them even, the soldier is a favorite claimant, and through the whole series of their provisions he is substantially so in fact. At a very early period while these lands were almost wholly in a state of nature, covered by their *Page 194 
aboriginal population, and having no legislative provision respecting them, excepting only the being forbidden to all others; she pledged them, or a part of them, to him as a reward for his services. As times advanced, and the State in progression made different orders and dispositions respecting them, his interests were always sedulously attended to by her. That she would now by this act lay aside all her former tutelage, and postpone his claim to the simple purchaser in John Armstrong's office, and in the county offices, would be incongruous and inconsistent indeed, — a construction which I can not possibly think correct.
It is further said in the argument, that this act is future, and that it only amounts to a legislative promise, necessarily presuming not only the existence of actual deficiency of tillable land, but also this is to be proved by evidence; then legislative interposition is to be made to render this promise efficient by the establishment of a district for this purpose, or in some other way. The complexity of this mode and the difficulty attendant upon its execution imposes a negative upon it, were there no other objections. If better proof of the deficiency of tillable land is wanted by the State than that of her own accredited officer, who has been intrusted with the execution of the whole business previous to this time who has necessarily traversed in the discharge of his duty the whole surface of the military reservation, who has made all the locations and surveys then existing therein, it is difficult to perceive what that better proof could be. Taking it in the abstract, one creditable witness is sufficient by our law to prove any fact, unless in a few excepted cases, one of which this is not, neither does their principle apply to it; surely the objection of want of credibility can not be taken by the State to her own officer, who has so highly possessed her confidence. This fact of deficiency, then, is as well proved as facts in general are or *Page 195 
require to be; being established by one credible witness, and he necessarily cognizant of the fact. A mode of proof mentioned in argument is a resurvey of all the lands appropriated, and an examination of the surface of the reservation by one or more persons appointed for the purpose. As has been observed, the difficulty of this enterprise, the time to be consumed in the execution of it, and the expense, would form an extreme case that never would be resorted to, and, if it was, would not be more satisfactory than the former; every mode, other than by survey and examination would be still less so, — such as the testimony of persons from different parts of the limits at the bar of the Legislature.
But while all this should be transacting, what becomes of the fund? What protects it in the interim? Nothing; surrendered by the Act of April to the pleasure of the removed warrants, and still liable to be selected from by them, what prospect at a distant period for the military claimant who has as yet made no progress in getting his land? Beyond this fund thus laid open to all he can not look; the State has no other in reserve. To establish a hypothesis of this kind as the erection of a district at a future time, upon future events, to be brought into existence by means we know not, is contrary to the purview of all the antecedent acts on the subject; involving difficulties insurmountable in practice, irreconcilable with the existing state of things, and certainly as holding out a benefit to the soldier that would prove illusory in the extreme. Such an interpretation of the act can not for a moment be entertained; when the letter of the law does not in plain terms show its intention, it shall never by construction impute bad faith to the State; but the spirit of the whole of the acts on the subject shall govern; that is, to confer upon her military claimant a benefit, not an injury. And, as all the vacant lands in the State *Page 196 
were open to him before in a certain event, instanter, this act must be intended to be cumulative, dispensing with that condition, and opening to him the same fund in common with other claimants.
The Cession Act has been adduced and relied upon to show that a future provision, by erection of a district, was contemplated by the Legislature. But the object of that section or condition of the Cession Act is evidently the preservation of rights then existing under her laws, in as ample a manner as if the Cession Act had not been made; and the enumeration of her land claimants and the mention of their particular claims, is only in majorem cautelam, and shows her solicitude that no injury should he done by her transfer of sovereignty to the United States. But if the phraseology could be considered as having any effect upon vested rights by previous acts, or intended to have any, it would not support the point contended for; for it says, "such officer or soldier shall be permitted to take his quota, c., in any other part of said territory," excluding the idea of any other agency.
The second general position is, that a void grant may be shown to be so on a trial in ejectment.
This position, to a certain extent, was not controverted on the other side; they admitted that a grant absolutely void might be impeached on a trial in ejectment, but they denied that this could be done in the cases where the grant was voidable only; that in these an investigation of the circumstances and facts in avoidance could not be made in this action. That Lowry's grant was not a void grant, that at the most it was only voidable, (which they did not admit), and not impeachable by parol evidence. The points in difference were the fixing the boundaries between void and voidable, and what evidence was properly adducible to show a grant void.
As I have considered the defendant's grant *Page 197 
neither void nor voidable from any circumstance that appears upon this case agreed, it is not absolutely necessary for the decision of this cause to give any further opinion in addition to what has already been incidentally stated on these points; but as it may be expected some notice should be taken of a point so much argued, I shall briefly take a review of some of the English and American authorities relative thereto, and state what I consider to be the law on the subject as applicable to a State grant for land in this country.
In England, as well in the cases where the king's letters-patent were void ab initio, as in the cases where they became void by matter subsequent, the usual practice was to declare them so uponscire facias, the process generally used to repeal them; sec. 2, Saunders, 72, note 4 and authorities there cited, and 4 Inst. 88. In many other actions also the king's letters-patent have been declared void by the Court; as in 12 Co. 86, where the king granted twenty acres out of his manor of D. by letters patent, they were adjudged void for uncertainty. This was upon petition in the Exchequer. So in 5 Co. 94, the queen's letters-patent were declared void, for she was deceived — the valuable and material part of the consideration being false. This was in an information of intrusion. So in 10 Co. 110, the letters-patent were declared void for a false suggestion. This was in ejectment upon special verdict finding the letters-patent and other records. So in 1 Co. 26-31, letters-patent were held void, for the grant contrary to the rules of law. This was upon information of intrusion. On the other hand, 10 Co. 67, a case of information of intrusion, 2 Co. 54, a case of trespass; 6 Co. 50, case of petition to the king, and referred to the Chancellor and others; 2 Co. 17, and Plowd. 454-456, cases of petition in the Exchequer, are instances where the validity of the letters-patent was *Page 198 
controverted, and they were adjudged good; but in all these cases it is to be observed, the letters-patent were spread on the record, and the validity or invalidity of them appeared upon the face of the letters-patent themselves, or upon them and other records taken together. Mr. Justice Blackstone, in his commentaries, says. "When it appears from the face of the grant that the king is mistaken or deceived, either in matter of fact or matter of law, as in case of false suggestion, misinformation, or misrecital of former grants, or it his own title to the thing granted be different from what he supposes, or if the grant be informal, or if he grant an estate contrary to the rules of law, — in any of these cases the grant is absolutely void. 2 Bl. Co. 348. These authorities incontrovertibly prove that where the king's grant is absolutely void, and the matter rendering it so appears upon the face of the grant singly, or in conjunction with other records, and this matter is spread upon the record in some suit so as to come judicially before the Court to be passed upon, the judges have always declared them void, or otherwise, according to the nature of the case; and this, notwithstanding some authorities say that a void grant is to be declared so upon a scire facias brought for the express purpose. The king's letters-patent have also been declared void upon a bill in equity, as in the case of the Attorney-General v. Vernon, Brown and Boheme, 1 Vern. 388. In this case it is said that the scire facias is not in all cases a competent remedy to avoid letters-patent. It is not so, wherever the matter in avoidance is dehors the grant, and appears not in the body of it; per Montague, C. B., and Jones, C. J. In all such cases they say the scirefacias will not reach it, therefore the remedy is by bill in equity, and so decided in this case, and the letters-patent decreed to be delivered up and cancelled, Ibid. 392.
It is to be observed that many things in England *Page 199 
were the subject-matter of grant, and passed by letters-patent, which are unknown amongst us, such as the numerous host of franchises, exemptions, imposition, and offices, the appendages of royalty and prerogative, tolerable perhaps in England, but here unsuitable and of course non-existing, being perfect sinecures, were the eager objects of acquisition by letters-patent, and the fruitful sources of litigation afterwards; with these the books are filled, but furnish not the best examples to draw inferences from, and illustrations of the present case. The things constituting the object of letters-patent most common to both countries are new inventions and lands. The public lands in England were vested in the king in his political capacity as sovereign, and were for the public benefit transferable by him, the usual evidence of which was his letters patent. Our public lands are also transferable for the public benefit, and usually also, by letters-patent under the great seal of the State, but there is this difference in the two cases; that in England the particular consideration, the moving cause, the grounds and reasons influencing the king, and the other motives inducing the transfer rest with him in the first instance, unlimited and unrestrained by positive law, they were therefore generally in the form of recitals incorporated with the letters-patent, and made a constituent part thereof, appearing on their face. With us the case is widely different, our positive written institutions either in the form of a constitution or statute, or both combined, have prescribed what lands shall be transferred from the public fund, on what occasion, and for what consideration. From this difference of practice, it necessarily results that many of the questions originating upon letters-patent in England have not occurred, and are likely not to occur here; the particular temptations for fraudulent acquisition, and the facilities for accomplishing it, not being afforded. Many of them can not occur at all, and *Page 200 
others depending upon the principles of the common law interwoven with the prerogative are here anticipated and settled beforehand by the general statute law of the State. Hence the question of valid or not upon a State patent for land has assumed somewhat of a different form from what it would be in England on letters-patent for the same thing, and the distinction between void and voidable is more clearly marked in the decisions of our own country thereon.
Having premised these observations, I will now proceed to take a short review of some of the American authorities, which for the above reasons I conceive to be more apposite to the present case than, the English. In the State of New York, the doctrine seems to prevail, that, in ejectment where there are two conflicting patents, the elder must be impeached and set aside before any title set up under the younger patent can be acknowledged. The distinction between void and voidable is made that the former must appear on the face of the patent to render it void in a court of law; that the latter is for matterdehors the grant, as fraud, irregularity or mistake, which only can be avoided by suit on being directly put in issue by the pleadings. That chancery is the proper tribunal for this suit, either upon scire facias, or bill, or information. It is further remarked, that it would be against precedent, and of dangerous consequences to titles to permit letters-patent, which are solemn grants of record, to be impeached collaterally by parol proof in this action. Jackson v. Lawton, 10 Johns. 26.
In Virginia, it has been decided that matter dehors the grant might be shown in avoidance at law, and this even by parol proof in an action of ejectment; but Saint George Tucker, in his notes on Blackstone's Commentaries contests the propriety of this decision, and contends that in a court of law upon a collateral issue no evidence ought to be admitted to avoid the patent, which is not at least of equal or superior *Page 201 
dignity to the patent itself; and he puts the case of two patents produced in ejectment by the opposite parties for the same land. If one, he says, appears on the face to be perfect, and the other defective, the perfect one ought to prevail, unless it can be shown that the perfect one hath been repealed by judgment of the High Court of Chancery, for some fraud or false suggestion of the parentee; if both patents are apparently perfect on the face the elder ought to prevail by the established rules of law, as, being of equal dignity, they can not stand together. But if the younger recite that the former hath been forfeited by due course of law, and that for that cause the younger hath issued; here, says he, the evidence arising out of the younger patent would be sufficient to avoid the elder, being of equal dignity with it, and containing matter sufficient to render that void which on the face appeared perfect.
In Maryland, the practice has been from the earliest times, to examine into the validity of letters-patent for the proprietor's lands in chancery, either by scire facias, as in 1 Har. M'Hen. 165, or by bill in equity, as in pages 23 to 26 of same book, or by information in equity, same book, pages 92 to 144; in all which cases, the letters-patent were recalled, and cancelled by the chancellor. Indeed, it is held in 2 Har. M'Hen. 141, by the chancellor, that the elder grant till repealed in chancery, must prevail at law against a younger grant.
In South Carolina, a court of law will not look beyond the date of the grant, considering all prior objections thereto as disposed of by the Court of Caveats, and this antecedent matter for ever, foreclosed by its issuance. 2 Bay, 426, 456.
With these two exceptions, to-wit, that where the chancellor of Maryland held the elder grant must prevail until repealed; and the other, the case of Wills v. Hambleton, 1791, in the Court of Appeals of *Page 202 
Virginia, where it was held, the patent might be made void by parol evidence in ejectment; with these two exceptions, I say, which form extreme cases, the decisions of the different States as far as I have had an opportunity of consulting the books, do not permit a State grant to be avoided in ejectment by parol proof; but if the grant is absolutely void for matter apparent on its face, or for matter that may be collected from the inspection of the grant, and from the records of the country taken together, such records as in contemplation of law are known to all men; then it may be impeached when exhibited as evidence, either on ejectment or any other action, and held void. But if the matter in objection to the grant is not of that nature that it may be known to all men, then it is only in avoidance, being dehors
the grant, as fraud's in the officers and party, irregularities in the previous steps required, non-compliance with particular forms, c.,c., before issuance; these, and others of a like nature, only can be shown upon a suit brought for the purpose of impeaching the grant. What this suit should be, has in this State, and the State of North Carolina, been spoken doubtfully of, and upon which I shall not at present undertake to express an opinion. In England, it is by scirefacias, by petition, and in one instance by bill in equity. In Maryland, by scire facias, by bill in equity, and by information in equity. In New York, the same practice as in Maryland, seems to be recognized as a correct practice.
Conning the question of the States grant for lands being absolutely void or a nullity, to be decided by the grant itself and the public law of the land, is a plain, simple, easy test, and of public convenience. In far the greater number of instances, it will carry with it the evidence of its own validity; the purchaser under it will see, or at least the law presumes he will, and he may so in fact, unless he is ignorant of the law, whether it be good or not. Unembarrassed with the *Page 203 
examination of the numerous circumstances that possibly might exist, and which only can be brought forward on a direct proceeding to impeach it, he is relieved from the apprehension of them, and also from their investigation on all collateral issues, and in case of a direct proceeding he has notice of the attack, and the points to be insisted on, and so be prepared in the defence if the case admits it.
That a void grant for land only, and not a voidable one, can be taken advantage of in ejectment; and that its being void, must appear so by itself and the public law of the country, is considered to be the doctrine in the case of Polk's Lessee v. Wendal and others. It is understood to be the law of New York, Maryland, North Carolina, and South Carolina, the opinion of Saint George Tucker of Virginia, and, as I think, the law of this State. That the validity of a grant for land should be otherwise tested than by itself and the public law of the country would be to display its security and solemnity, and totally to deprive it of that confidence, which as the highest evidence of the highest property of the country, it ought to possess and be by all considered and taken to possess; and this for the quiet and repose of the public in general.
Judgment must therefore be entered up for the defendants.